**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**ATLANTIC RICHFIELD COMPANY,**

      Plaintiff,

v.                                        No. 1:15-cv-56-JAP/KK

**UNITED STATES OF AMERICA**,
**THE PUEBLO OF LAGUNA, an Indian**
**tribe**, and **LAGUNA CONSTRUCTION**
**COMPANY, INC.,**

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

This lawsuit involves a dispute over who must pay for environmental cleanup and remediation at the Jackpile Paguate uranium mine, located in Cibola County, New Mexico within the boundaries of the Pueblo of Laguna. The Environmental Protection Agency (EPA) recently listed the mine on the National Priorities List (NPL), 40 C.F.R. § 300, App. B (2015). Plaintiff Atlantic Richfield Company (ARCO or Plaintiff) subsequently filed a COMPLAINT (Doc. No. 1) (Complaint) maintaining that it was not responsible for "funding or performing any environmental reclamation or remediation work at the . . . Mine." *Id.* ¶ 1. ARCO seeks cost recovery, contribution, and declaratory relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601–9675 from Defendants United States of America, the Pueblo of Laguna, and Laguna Construction Company, Inc.

On May 26, 2015, the United States moved to dismiss Plaintiff's claims against it under Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 12 (b)(1). *See* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF SUBJECT

MATTER JURISDICTION BY UNITED STATES OF AMERICA (MTD) (Doc. No. 32). For

the reasons discussed below, the Court will grant the United States' MTD.[1]

## BACKGROUND

The following is a summary of the facts alleged in ARCO's Complaint.

1. <u>The Atomic Energy Act creates a government monopsony in the market for uranium, but the United States outsources mining and milling of uranium to private operators in order to lower costs and maximize production of uranium yellowcake.</u>

Congress created the Atomic Energy Commission (AEC) as part of a postwar "program

for Government control of the production, ownership, and use of fissionable material to assure

the common defense and security and to insure the broadest possible exploitation of the fields."

(Complaint ¶ 33 (quoting the Atomic Energy Act of 1946, 60 Stat. 755, 756 (1946)). Shortly

thereafter, the AEC "began a nationwide program to discover and acquire uranium ore and

concentrate." (*Id.* ¶ 34). Because the AEC did not itself have the expertise necessary to

efficiently exploit the United States' uranium reserves, it "devised and implemented a plan to

incentivize and to assist private industry to mine and mill uranium ore and then sell uranium to

the United States Government." (*Id.* ¶ 35).

The plan worked as follows. After conducting its own prospecting and constructing pilot

uranium mines and milling facilities, the AEC estimated how much it would cost private parties

to mine and process uranium ore. (*Id.* ¶ 38). The AEC then developed a set of "Circulars" that

advertised "guaranteed ore prices, haulage and mine development allowances, production

bonuses, and grade premiums" in order to encourage private entities to mine uranium for sale to

---

[1] In reaching this decision, the Court considered ATLANTIC RICHFIELD COMPANY'S RESPONSE IN OPPOSITION TO UNITED STATES' MOTION TO DISMISS (Doc. No. 46) (Response) and UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS AND MEMORANDUM IN SUPPORT (Doc. No. 64) (Reply).

the government or other licensed purchasers. (*Id.* ¶ 37–38).[2] The AEC also conducted aerial surveys of radiometric anomalies and published the surveys in designated public areas throughout the Western United States. (*Id.* ¶ 38).

The government withdrew hundreds of thousands of acres of land from the public trust, building roads and constructing uranium ore-buying stations. (*Id.* ¶ 39–40). It "implemented a comprehensive drilling program…designed to find high-grade uranium ore as rapidly as possible for mining and delivery to existing mills, to supply reserves for proposed mills, to show miners where additional reserves were located near existing mines, and to develop reserves in areas where private companies would not normally make the attempt." (*Id.* ¶ 40). The government's clear aim was to maintain its monopsony in the market for uranium while driving down the cost of uranium by outsourcing mining and milling to private entities. (*Id.* ¶ 39).

2. The AEC refuses to purchase ore with less than 0.1% uranium content, leading to environmental contamination at uranium mines.

Because the government enjoyed monopsony power over the market for uranium, it could dictate the terms of purchase in furtherance of its "main objective"—"the acquisition of uranium concentrate or 'yellow cake.'" (*Id.* ¶ 44). The AEC published a Circular stating that miners would be paid for ore with uranium content of 0.10% or more, that "the transport of uranium ore below 0.10% uranium was discouraged, and any sub-grade uranium ore brought to an ore buying station could be confiscated as liquidated damages[.]" (*Id.* ¶ 42). The AEC also refused to negotiate the price of uranium ore and "unilaterally set ore prices on a sliding scale," with higher prices paid for ore with a higher uranium content. (*Id.* ¶ 43).

Between 1947 and 1960, the AEC entered into approximately 32 procurement contracts with private companies for the purchase of uranium concentrate. (*Id.* ¶ 45). Each agreement

---

[2] The Atomic Energy Act outlawed the possession or transfer of "fissionable material" (i.e., uranium) "except as authorized by the [AEC.]" 60 Stat. 760.

varied, but "most provided for the construction of a uranium mill to be operated by the private contractor, specified the particular uranium mines that could provide the raw materials for the mill, and contained a fixed price for the uranium ore that the mill owner or operator would pay to the miners." (*Id.*)

"The production of waste at uranium mine sites was a known and intended result" of the AEC's purchasing regime. (*Id.* at 48). Miners were barred from selling uranium ore to anyone except the AEC or its authorized procurers, and the AEC set the price of uranium. But the AEC "did not include the cost of managing waste or the cost of waste disposal or mine reclamation in the price it paid miners for uranium ore." (*Id.*) Because the AEC refused to purchase uranium ore with less than 0.10% uranium content and did not compensate miners for the cost of extracting and properly disposing of unwanted ore, unwanted ore was invariably dumped at or nearby the place of extraction. (*Id.*).

3.  <u>The Anaconda Copper Mining Company, predecessor in interest to ARCO, leases the Jackpile Paguate Site from the Department of the Interior for uranium extraction.</u>

By the early 1950s, AEC geologists had begun exploring the Laguna Reservation for uranium deposits. (*Id.* ¶ 56).[3] The AEC intended to exploit any uranium found on the Laguna Reservation for its uranium development program. (*Id.* ¶ 56). The AEC "recommended to the Laguna [Pueblo] that [it] obtain the assistance of a legitimate mining company to develop uranium deposits on the Laguna Reservation so that the Laguna could receive royalties and the uranium ore could be mined and sold to the AEC." (*Id.* ¶ 57).

In 1951, Defendant Laguna Pueblo, with the approval of the United States Bureau of Indian Affairs ("BIA"), entered into a prospecting agreement with the Anaconda Copper Mining Company ("Anaconda"). (*Id.* ¶¶ 58–59). Under the agreement, Anaconda was allowed to explore

---

[3] Laguna Pueblo is a federally-recognized Indian tribe. Defendant United States holds legal title to the land occupied by the Tribe in trust for the Tribe's benefit. (Complaint ¶¶ 54–55).

4

approximately 410,000 acres of the Laguna Reservation for uranium deposits. (*Id.*) In 1952, Anaconda and Laguna Pueblo entered into BIA-approved mining leases permitting Anaconda to prospect and mine uranium from the Jackpile Site in exchange for royalty payments. (*Id.* ¶ 60– 61).

Anaconda, in turn, entered into a series of contracts with the AEC to supply milled uranium mined from the Jackpile Site. (*Id.* ¶ 61). The price AEC paid for milled uranium was determined by AEC price schedules, and the AEC conducted its own independent evaluations of the Jackpile Site's ore reserves, production capacity, and Anaconda's mining plans for the site. (*Id.* ¶¶ 61, 64).

From 1952 to 1970, Anaconda mined over nine million tons of uranium ore from the Jackpile Site and milled it into 46 million pounds of uranium concentrate, all of which the United States purchased. (*Id.* ¶ 63). Anaconda paid Laguna Pueblo $5 to $10 million dollars in mining royalties each year. (*Id.* ¶ 64). The BIA examined Anaconda's books during the mining period to ensure Laguna Pueblo was receiving all the royalties it was owed under its mining contracts with Anaconda. (*Id.* ¶ 65). Throughout the mining period, various other United States agencies were involved in oversight of Anaconda's mining operations at the Jackpile Site. (*Id.* ¶ 66).

4.  <u>The United States ends its procurement program, the environmental hazards of uranium waste at the Jackpile Site become apparent, and ARCO executes an agreement with Laguna Pueblo purporting to assign ARCO's CERCLA liability to the Pueblo.</u>

By the 1960s, the United States had all the uranium concentrate it needed, and then some. In 1962, the AEC lifted the prohibition on private sales of uranium concentrates, but it soon realized that there was no significant private demand for uranium concentrate. (*Id.* ¶ 49–50). The AEC deferred miners' contractual obligations to deliver uranium concentrate by several years in what was essentially an acknowledgement that private demand would not replace the United

States' subsidies. (*Id.* at ¶ 51). The United States ended its procurement program altogether in 1971. (*Id.* ¶ 52).

Mining operations at the Jackpile Site continued until 1982. (*Id.* ¶ 72). By the 1970s, the United States Bureau of Land Management (BLM) and the United States Geological Survey (USGS) were conducting site inspections and otherwise overseeing the mine Site and periodically issuing instructions to Anaconda concerning reclamation efforts at the Jackpile Site. (*Id.* ¶ 67–68). When Anaconda began decommissioning the Jackpile Site in 1982, USGS directed Anaconda to "preserve the ability to recover additional uranium" from the Site in the future. (*Id.* ¶ 71).

Before the Jackpile Site was decommissioned, Anaconda (and its successor in interest, Plaintiff ARCO) "developed a series of comprehensive remediation plans that it was prepared to implement at the Jackpile Site." (*Id.* ¶ 72). Rather than allowing ARCO to perform the remediation work, however, Laguna Pueblo decided (with the United States' approval) to assume responsibility for cleaning up the Jackpile Site, so long as ARCO agreed to "provide the funds necessary to perform that work[.]" (*Id.* ¶ 73). The United States and Laguna Pueblo devised their own set of proposed remediation measures and an estimated cost of the remediation work as part of the negotiations with ARCO. (*Id.* ¶ 75).

On December 12, 1986, Laguna Pueblo and ARCO executed an Agreement to Terminate Leases (the "Agreement") (Doc. No. 1-2). The Agreement terminated ARCO's leasehold on the Jackpile Site and "'establish[ed] a final and binding legal basis for reclamation' of the Jackpile Site." (Complaint ¶¶ 77–78 (quoting Agreement at 2)). Laguna Pueblo agreed that it would "'assume full and complete responsibility and liability under all applicable laws…for…the cleanup, reclamation or other environmental remedial action at the [Jackpile Site].'" (*Id.* ¶ 79

(quoting Agreement at 3)). Laguna Pueblo also agreed to release ARCO "from all responsibility and liability for reclamation of the [Jackpile Site], for performing other environmental remedial measures relating to the [Site], and for all other obligations arising under the leases." (*Id.* ¶ 81 (quoting Agreement at 2)).

In relevant part, the Agreement provides:

> 3.     In consideration for the monies to be paid by Anaconda under Paragraph 2 of this Agreement, Anaconda will be deemed to have met all of its reclamation and other environmental obligations relating to the [Jackpile] Mine, and The Pueblo, with the approval of the Secretary of the Interior, hereby releases Anaconda from all responsibility and liability for reclamation of the Mine, for performing other environmental remedial measures relating to the mine, and for all other obligations arising under the leases, including all bonding requirements, and will:
>
>> (a)     Assume full and complete responsibility and liability under all applicable laws, including any obligations imposed by Anaconda's leases with The Pueblo, for:
>>
>>> (i)     the cleanup, reclamation or other environmental remedial action at the mine; and
>>>
>>> (ii)     conducting all other related and necessary activities in a manner acceptable to, or required by governmental agencies with jurisdiction over reclamation and other related environmental programs, and which is otherwise consistent and in compliance with all applicable environmental laws and regulations; and
>>>
>>> (iii)     obtaining requisite approval for such activities from the appropriate governmental authorities.
>>
>> (b)     Indemnify and hold Anaconda harmless from, and reimburse Anaconda and its officers, directors or agents for any amounts paid or expenses incurred, including attorneys' fees and expenses, because of any claim, liability or obligation
>>
>>> (i)     related to cleanup and reclamation of the Mine, or

(ii)   asserted under any applicable law or regulation, and relating to the Pueblo's obligation hereunder, including without limitation effects due to the generation, treatment, storage or disposal of hazardous substances or wastes, or toxic chemicals, or related activities, by Anaconda on The Pueblo lands including, but not limited to, any liability or obligation which exists or arises under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and the Resource Conservation and Recovery Act (RCRA).

(c)   Release Anaconda from any and all claims by the Pueblo, and refrain from filing any claims or actions on behalf of The Pueblo, for damages to The Pueblo's natural resources, or for recovery for the costs of cleanup and reclamation under CERCLA or other applicable law, including damages caused by blasting at the Mine.

Agreement at 3–4.

The United States Department of Interior approved the Agreement. (*Id.* ¶ 81). According to ARCO, by signing the Agreement, the Secretary of the Interior also committed to "refrain from…attempting to obligate Anaconda to engage in cleanup, reclamation or other environmental remedial action at the [Jackpile Site]." (*Id.* ¶ 83 (quoting Agreement at 7)).

In exchange for these promises and releases of liability, ARCO paid $43.6 million to Laguna Pueblo to perform the cleanup work, and donated to Laguna Pueblo all of the structures and facilities on the Jackpile Site, including a railroad spur and water, sewage, and power systems. (*Id.* ¶ 87). After the Agreement became effective, ARCO abandoned the Jackpile Site and has not occupied it since. (*Id.* ¶ 89).

5.   Defendants botch the cleanup job.

In October 1986, the BLM and BIA filed a Final Environmental Impact Statement (EIS) with the EPA. (*Id.* ¶ 90). The EIS noted that the United States had a trust obligation to Laguna Pueblo "to determine the extent of the environmental remediation required at the Jackpile Site."

(*Id.* ¶ 91). After the EIS was completed, the BIA and BLM issued a Record of Decision in December 1986 that "established the requirements for environmental remediation at the Jackpile Site." (*Id.* ¶ 92). The Record of Decision states that remediation of the Jackpile Site should be guided by two "important objectives[:]…ensure human health and safety…and…reduce the releases of radioactive elements and radionuclei to as low as reasonably achievable at the Site." (*Id.* ¶ 93 (internal quotation omitted)). The Record of Decision adopted a remediation plan that would "ensure that adverse impacts are reduced to the extent possible." (*Id.* ¶ 94).

In March 1987, the BIA and Laguna Pueblo entered into a "Cooperative Agreement…to perform the management, coordination and administration of the environmental remediation work" at the Jackpile Site. (*Id.* ¶ 95 (internal quotation omitted)). Under the agreement, the BIA had "approval responsibility" over key remediation decisions, including subcontracting, design work, investments, financial plans, and high-level personnel decisions. (*Id.* ¶ 96 (internal quotation omitted)). Laguna Pueblo, the BIA, and other United States agencies formed the "Technical Proposal Evaluation Committee" to evaluate design proposals and remediation work. (*Id.* ¶ 97). A BIA engineer was directly involved in the design phase of the remediation project. (*Id.* ¶ 98).

Although the ostensible purpose of the remediation project (and the $43.6 million ARCO paid to Laguna Pueblo) was to "ensure human health and safety…and…reduce the releases of radioactive elements and radionuclei," (*Id.* ¶ 93), the BIA and Laguna Pueblo also wanted to use the remediation project and ARCO's payment for economic development. To that end, Laguna Pueblo incorporated Defendant Laguna Construction Company ("LCC") under New Mexico law. Laguna Pueblo then channeled the payment from ARCO to LCC in order "to develop technical expertise" with remediation work so that LCC could then compete for other projects. (*Id.* ¶ 102).

9

In other words, Laguna Pueblo and BIA saw ARCO's settlement payment (and by extension any remedial work on the Jackpile Site) as a means to an end: establishing "a continuing source of income and employment" for Laguna Pueblo members. (*Id.* ¶ 103–104).

The BIA and Laguna Pueblo's goal of providing a "stepping stone" for the Pueblo's economic development soon came into conflict with the remediation project's goal of reducing to the extent possible radioactive contamination at the Jackpile Site. ARCO alleges the United States "failed to ensure adequate supervision and oversight of the Laguna's and [LCC's] cleanup work at the Jackpile Site." (*Id.* ¶ 105). Although the BIA initially insisted that an "independent Construction Management Contractor" oversee LCC's remediation work, Laguna Pueblo successfully lobbied the BIA to cede oversight responsibility of the remediation project to LCC. (*Id.* ¶¶ 106–107). Without ARCO's consent and knowing that LCC had little experience with remediation work, the BIA "shifted most of the independent Construction Management Contractor's responsibilities to [LCC]" in 1990. (*Id.* ¶ 107).

Following this shift in responsibilities, the Construction Management Contractor was replaced with a "Construction Engineering Contractor, whose responsibilities were limited to third-party verification and review of work packages." (*Id.* ¶ 109). Later in 1990, the BIA simply eliminated the Construction Engineering Contractor position altogether, ceding complete responsibility over project management to Laguna Pueblo and LCC. (*Id.* ¶ 110).

Despite Laguna Pueblo and LCC's increased responsibility and control over remediation work, the BIA and BLM continued to provide engineering and design input in the cleanup project. (*Id.* ¶ 111–112). Roger Baer, BIA civil engineer, attended weekly project meetings. (*Id.* ¶ 112–113). Baer reviewed and approved reports and work packages. (*Id.*) Throughout the

project, Baer and other BIA employees were involved in quarterly inspections and important engineering decisions. (*Id.* ¶¶ 115–116).

According to the Complaint, the BIA and Laguna Pueblo's remediation work was shoddy. Specifically, ARCO alleges that Defendants performed an "inadequate assessment of the environmental risks created" and in any event "fail[ed] to perform adequate monitoring to determine whether Defendants' remediation had been effective," "fail[ed] to respond to indications that [Defendants'] work was ineffective," and "deviat[ed] from the Record of Decision [by] decreas[ing] the environmental protections originally prescribed." (*Id.* ¶ 119).

The Court will defer to another day a detailed recitation of the Complaint's allegations of incompetence and apparent malfeasance in Laguna Pueblo's reclamation work. Although many years have passed since the BIA and Laguna Pueblo declared the remediation work "completed" in 1995 (*Id.* ¶ 117), nothing of any real legal significance (at least with respect to the motion to dismiss now before the Court) took place between 1995, when Defendants allegedly finished their first reclamation effort, and 2007, when Laguna Pueblo hired an independent consulting firm to evaluate whether the Pueblo's reclamation work complied with the BIA's Record of Decision. (*Id.* ¶ 129).[4]

6.   Defendants attempt to shift responsibility for environmental remediation to ARCO.

In 2010, EPA sent ARCO a request under 42 U.S.C. § 9604(e) for information and documents related to the Jackpile Site. (*Id.* ¶ 160). ARCO produced approximately 43,000 documents in response to EPA's request in March 2011. (*Id.*). ARCO also hired URS Corporation, a consultant, to identify other potentially responsible parties (PRPs in CERCLA-speak, *see* 42 U.S.C. § 9604(a)) and to analyze "current conditions at the Jackpile Site and the

---

[4] The consulting firm concluded that Defendants' remediation work was "not successful in prevent[ing] or mitigat[ing]…public health or environmental impacts." (*Id.* ¶ 134 (internal quotation omitted)).

success of the cleanup work performed by the Laguna and [LCC] under government oversight." (*Id.* ¶ 161).

On March 15, 2012, EPA proposed listing the Jackpile Site on the National Priorities List (NPL), 40 C.F.R. § 300, App. B.[5] In response, ARCO submitted comments on EPA's Hazard Ranking System documentation for the Jackpile Site, which was used to determine whether the Site would ultimately be listed on the NPL. (*Id.* ¶ 162). In May 2014, EPA "advanced its determination that a CERCLA remedial investigation and feasibility study ("RI/FS") must be completed for the Jackpile Site, and . . . sought to place sole responsibility for funding and/or performing the RI/FS on [ARCO]." (*Id.* ¶ 163). ARCO has "retained technical experts" and "incurred other costs to respond to EPA's demand." (*Id.*)

## STATEMENT OF LAW

### A.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a Complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The Supreme Court has articulated a two-step approach for district courts to use when considering a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court must identify the adequately pleaded factual allegations contained in the Complaint, disregarding any unsupported legal conclusions. *Id.* at 678. While a Complaint need not include detailed factual allegations, it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Next, having identified the adequately pleaded facts, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Stated concisely, "[t]o survive a motion to dismiss, a Complaint must contain sufficient

---

[5] The NPL is a list of national priorities among the known or threatened releases of hazardous substances, pollutants or contaminants throughout the United States that 42 U.S.C. § 9605(a)(8)(B) requires the EPA to maintain.

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678.

A claim is facially plausible when the Complaint's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility lies somewhere between possibility and probability; a Complaint's "allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008). The key question is not whether the plaintiff is likely to be able to prove his allegations. Rather, a motion to dismiss tests the legal sufficiency of a plaintiff's claims. If these claims are legally deficient or are "so general that they encompass a wide swath of conduct," much of which is not legally actionable, "then the plaintiff[] ha[s] not nudged [its] claims across the line from conceivable to plausible." *Id.* In evaluating a motion to dismiss, the court views the Complaint in the light most favorable to the plaintiff. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013).

## B.  The Structure and Purpose of CERCLA

Broadly speaking, CERCLA promotes "the timely cleanup of hazardous waste sites" and ensures "that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks omitted). To accomplish these goals, the Act imposes strict liability for remediating the release or threatened release of hazardous substances on four classes of people:

> (1)    any owner or operator of the vessel or facility where a release or threatened release occurred, 42 U.S.C. § 9607(a)(1);

> (2)    any person who owned or operated a facility at "the time of disposal of any hazardous substance," 42 U.S.C. § 9607(a)(2);

> (3)    any person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or

> incineration vessel owned or operated by another party or entity and containing such hazardous substances," 42 U.S.C. § 9607(a)(3); and
>
> (4)   "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," 42 U.S.C. § 9607(a)(4).

These four classes, which include past and present owners and operators, transporters, and those who arrange for the disposal or treatment of hazardous substances, are commonly referred to as "Potentially Responsible Persons" or "PRPs." *See* 42 U.S.C. § 9604(a). CERCLA creates both public and private remedies against PRPs for financing the "expeditious cleanup of environmental contamination caused by hazardous waste releases." *Young v. United States*, 394 F.3d 858, 862 (10th Cir. 2005).

First, CERCLA empowers the federal government to protect the environment and the public from hazardous waste related environmental threats, 42 U.S.C. § 9604(a)(1), and recover its remediation expenses directly from PRPs, 42 U.S.C. § 9607(a)(4). Second, CERLCA "encourages private parties to assume the financial responsibility of cleanup" by creating a cause of action against PRPs for privately incurred removal and remediation costs. *Young*, 394 F.3d at 862; *see* also 42 U.S.C. § 9607(a)(4)(B). With regard to privately funded cleanups, CERCLA offers two forms of relief: cost-recovery and contribution. As the Supreme Court explained in *United States v. Atl. Research Corp.*, 551 U.S. 128 (2007), cost-recovery and contribution are "complementary" yet procedurally "distinct" remedies." *Id.* at 138 (quoting *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 163 n.3 (2004)). The *Atlantic Research* Court explained the distinction between cost-recovery and contribution as follows.

> CERCLA provide[s] for a right to cost-recovery in certain circumstances, § 107(a), and separate rights to contribution in other circumstances, §§ 113(f)(1), 113(f)(3)(B). . . .

Section 113(f) explicitly grants PRPs a right to contribution. Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." Black's Law Dictionary 353 (8th ed. 2004). Nothing in § 113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense. The statute authorizes a PRP to seek contribution "during or following" a suit under § 106 or § 107(a). 42 U.S.C. § 9613(f)(1). Thus, § 113(f)(1) permits suit before or after the establishment of common liability. In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties.

By contrast, § 107(a) permits recovery of cleanup costs but does not create a right to contribution. A private party may recover under § 107(a) without any establishment of liability to a third party. Moreover, § 107(a) permits a PRP to recover only the costs it has "incurred" in cleaning up a site. 42 U.S.C. § 9607(a)(4)(B). When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response. Rather, it reimburses other parties for costs that those parties incurred.

Accordingly, the remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances. Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a). And § 107(a) permits cost-recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs. Hence, a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution. But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a)....

*Atl. Research Corp.*, 551 U.S. at 138–140 (quotations, alterations, citations, and footnotes omitted). Distinguishing between a cost-recovery and a contribution claim is critical because the elements of each claim and the available remedies differ.[6] Here, ARCO asserts both cost-recovery and contribution claims against the United States.

---

[6] In general, cost-recovery defendants are jointly and severally liable for recoverable costs. *New Mexico v. GE*, 467 F.3d 1223, 1234 (10th Cir. 2006). In a contribution action, on the other hand, the court must "allocate response costs" among jointly and severally liable PRPs "using such equitable factors as the

## ANALYSIS

### A.  ARCO's Cost-Recovery Claims (Counts 1-3)

To succeed on a private claim for the recovery of cleanup costs from a contaminated site, a plaintiff must show that: (1) the site in question is a facility as defined by CERCLA; (2) defendant is a PRP with regard to the release or threatened release; (3) a release or threatened release of a hazardous substance has, in fact, occurred; (4) the release or threatened release caused the plaintiff to incur necessary response costs; and (5) these response costs are consistent with the National Contingency Plan (NCP).[7] *Young*, 394 F.3d at 862; *see also* 42 U.S.C. § 9607(a) (providing that a PRP "shall be liable for . . . any other necessary costs of response incurred by any other person consistent with the national contingency plan"). The parties' dispute centers on whether ARCO incurred "necessary costs of response." The United States argues that the facts in the Complaint do not plausibly support such a conclusion,[8] while Plaintiff disagrees.

Because Congress did not define "necessary costs of response" as a whole, resolving the parties' dispute requires a trip "down a convoluted path" through the United States Code. *See Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir. 1992). To begin, CERCLA defines

---

court determines appropriate." 42 U.S.C. § 9613(f)(1); *Friedland v. Indus. Co.*, 566 F.3d 1203, 1206 (10th Cir. 2009).

[7] The National Contingency Plan ("NCP"), 40 C.F.R. § 300 *et seq.*, "is the federal government's plan for responding to both oil spills and releases of hazardous substances (including radioactive materials). The NCP is at the heart of the National Response System, under which federal departments and agencies help state and local officials protect public health and the environment during hazardous materials emergencies." EPA, National Contingency Plan, http://www.epa.gov/radiation/rert/ncp.html (last accessed August 31, 2015).

[8] The United States also argues that Plaintiff's cost-recovery claims should be dismissed because Plaintiff has not adequately alleged that the costs it wants the United States to reimburse are "consistent" with the NCP. Because the Court agrees that Plaintiff's Complaint does not contain sufficient factual matter to support a plausible claim that Plaintiff incurred necessary response costs, the Court will not address the parties' related arguments regarding consistency with the NCP.

"response" as a "removal action" or a "remedial action." 42 U.S.C. § 9601(25). Each of these

terms carries its own lengthy definition. A "removal action"

> means the cleanup or removal of released hazardous substances
> from the environment, such actions as may be necessary taken in
> the event of the threat of release of hazardous substances into the
> environment, such actions as may be necessary to monitor, assess,
> and evaluate the release or threat of release of hazardous
> substances, the disposal of removed material, or the taking of such
> other actions as may be necessary to prevent, minimize, or mitigate
> damage to the public health or welfare or to the environment,
> which may otherwise result from a release or threat of release. The
> term includes, in addition, without being limited to, security
> fencing or other measures to limit access, provision of alternative
> water supplies, temporary evacuation and housing of threatened
> individuals not otherwise provided for, action taken under section
> 9604(b) of this title, and any emergency assistance which may be
> provided under the Disaster Relief and Emergency Assistance Act
> [42 U.S.C. 5121 et seq.].

42 U.S.C. § 9601(23).

In contrast, a "remedial action"

> means those actions consistent with permanent remedy taken
> instead of or in addition to removal actions in the event of a release
> or threatened release of a hazardous substance into the
> environment, to prevent or minimize the release of hazardous
> substances so that they do not migrate to cause substantial danger
> to present or future public health or welfare or the environment.
> The term includes, but is not limited to, such actions at the location
> of the release as storage, confinement, perimeter protection using
> dikes, trenches, or ditches, clay cover, neutralization, cleanup of
> released hazardous substances and associated contaminated
> materials, recycling or reuse, diversion, destruction, segregation of
> reactive wastes, dredging or excavations, repair or replacement of
> leaking containers, collection of leachate and runoff, onsite
> treatment or incineration, provision of alternative water supplies,
> and any monitoring reasonably required to assure that such actions
> protect the public health and welfare and the environment. The
> term includes the costs of permanent relocation of residents and
> businesses and community facilities where the President
> determines that, alone or in combination with other measures, such
> relocation is more cost-effective than and environmentally
> preferable to the transportation, storage, treatment, destruction, or

17

> secure disposition offsite of hazardous substances, or may
> otherwise be necessary to protect the public health or welfare; the
> term includes offsite transport and offsite storage, treatment,
> destruction, or secure disposition of hazardous substances and
> associated contaminated materials.

42 U.S.C. § 9601(24).

Although these definitions are broad, this does not mean a plaintiff may recover any and all costs no matter how loosely associated with a hazardous substances contamination. The Tenth Circuit Court of Appeals interprets the terms "response," "removal," and "remediation," with an eye to the overall structure, history, and purpose of CERCLA. Generally speaking, to qualify as a response cost, a cost must be incurred in actually fixing, i.e. investigating and/or remedying, the effects of a release or threatened release of a hazardous substance into the environment. *Young*, 394 F.3d at 863. CERCLA "is not a general vehicle for toxic tort claims." *Id.* at 862. Consequently, response costs do not include the "recovery of private damages unrelated to [a] cleanup effort." *Daigle*, 972 F.2d at 1535.

The statutory modifier "necessary" further reinforces the basic distinction between cleanup costs, which fall within the ambit of CERCLA, and consequential damages, which do not. By limiting recovery of costs to "necessary costs of response," Congress has ensured that private parties do not abuse CERCLA by recovering costs, e.g. those spent on property improvement measures, without contributing to public welfare enhancing cleanup efforts. In accordance with this principle, the Tenth Circuit has cited with approval other circuit courts of appeal that have held that a response cost is not recoverable unless it is "closely tied" to a cleanup effort. *Young*, 394 F.3d at 863. Or, as the Tenth Circuit has articulated it, "costs cannot be deemed 'necessary' to the containment and cleanup of hazardous releases absent some nexus between the alleged response cost and an actual effort to respond to environmental

18

contamination." *Id.* In a nutshell, "the heart of the definitions of removal and remedy are 'directed at containing and cleaning up hazardous substance releases.'" *United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir. Okla. 1992) (internal citation omitted). As a result, to qualify as a necessary cost of response a cost must be "necessary to the containment and cleanup of hazardous releases." *Id.*

Here, Plaintiff makes three arguments as to why the element of necessity does not require dismissal of Plaintiff's claims: (1) ARCO argues that a district court may not evaluate whether an alleged response cost is "necessary" prior to discovery because the question is fact-intensive and cost-recovery claims are not subject to any heightened pleading requirement; (2) in the alternative, ARCO claims it has alleged sufficient necessary response costs to survive a motion to dismiss; (3) finally, if the Court remains unconvinced, ARCO requests permission to amend its Complaint to add more specific allegations about the response costs it has allegedly incurred. Response at 10–14. On close inspection, none of these arguments hold water.

### 1. CERCLA Pleading Requirements

ARCO contends that the necessity, and therefore the ultimate recoverability, of its costs is "too fact-dependent to be decided on the pleadings." Response at 13. As an initial matter, the Court is unsure how to conceptualize this argument. Unlike a motion for summary judgment, a motion to dismiss does not test the sufficiency of a plaintiff's evidence. When faced with a motion to dismiss, the court simply asks whether the plaintiff has alleged facts which support a plausible claim for relief from the defendant. ARCO appears to be arguing that it is exempt from undergoing this examination. As ARCO explains it, "even if [the Government's arguments about necessary response costs] had merit, [they] are inappropriate for resolution under Rule 12(b)(6)." *Id.* In other words, according to ARCO, even if the costs ARCO seeks to recover do not qualify

19

for reimbursement under CERCLA, the Court is required to turn a blind eye to this fatal deficiency given the procedural posture of the case.

To support this position, ARCO notes that "*not one* of the cases cited by the United States involves a CERCLA claim being dismissed under Rule 12 because the alleged response costs were not necessary . . ." Response at 13. Such cases do, however, exist. *See*, *e.g.*, *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39, 43 (6th Cir. 1988) (dismissing plaintiff's cost-recovery claim for failure to allege necessary response costs); *General Cable Indus. v. Zurn Pex, Inc.*, 561 F. Supp. 2d 653, 658-659 (E.D. Tex. 2006) (same); *Ford Motor Co. v. Mich. Consol. Gas Co.*, Case No. 08-CV-13503-DT, 2010 U.S. Dist. LEXIS 88728, at *18-19 (E.D. Mich. Aug. 27, 2010) (same). Moreover, numerous courts have recognized that a plaintiff asserting a cost-recovery claim under CERCLA is required to plead recoverable response costs. *See, e.g., Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1154 (9th Cir. 1989) (to survive a motion to dismiss on a cost-recovery claim, a plaintiff must "allege at least one type of response cost cognizable under CERCLA"). As these cases demonstrate, to survive a motion to dismiss, a plaintiff asserting a CERCLA cost-recovery claim must plead facts which plausibly support each element of its claim, including facts showing that it incurred necessary response costs within the meaning of the statute.

ARCO's arguments to the contrary are not persuasive. First, ARCO emphasizes that CERCLA claims are not subject to a heightened pleading standard. While this is true, it does not mean that CERCLA claims are exempt from normal pleading requirements. Second, ARCO cites *Bd. of Cnty. Comm'rs of Cnty. of La Plata, Colo. v. Brown Grp. Retail, Inc.*, No. Civ. 08-855

LTB, 2009 WL 1108463, at *4 (D. Colo. Apr. 24, 2009).[9] In *La Plata*, the plaintiff alleged that it "has incurred, and will continue to incur in the future, necessary response costs to, among other things, investigate and evaluate the alleged contamination in a manner consistent with the [NCP]." *Id.* at *4. The defendant contended that this allegation was too conclusory to support a plausible inference that the plaintiff had in fact incurred necessary response costs. *Id.* The court, however, found that even though the plaintiff would "bear the ultimate burden of showing 'some nexus between the alleged response cost and an actual effort to respond to the environmental contamination,' it [was] sufficient at th[at] stage of the litigation that [plaintiff] ha[d] plead[] a recoverable cost." *Id.*

To the extent ARCO is asking that this Court adopt the reasoning in *La Plata* regarding the specificity with which response costs must be alleged, the Court rejects this invitation. The Court finds *La Plata* of minimal persuasive value because the district court – without any analysis at all – simply concluded that the Complaint made non-conclusory factual allegations that the plaintiff had incurred necessary response costs. But the Complaint's allegation that the plaintiff had "incurred, and will continue to incur in the future, necessary response costs to, among other things, investigate and evaluate the alleged contamination in a manner consistent with the National Contingency Plan" strikes this Court as no more than a "formulaic recitation of the elements of a cause of action" that cannot survive a motion to dismiss under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). In deciding whether a plaintiff has sufficiently alleged necessary response costs, a court should consider whether the factual allegations, as a whole, support such a conclusion. *Ford Motor Co. v. Mich. Consol. Gas*

---

[9] ARCO also cites *Norwest Financial Leasing, Inc. v. Morgan Whitney, Inc.*, 787 F. Supp. 895 (D. Minn. 1992) and *Raytheon Aircraft Co. v. United States*, 532 F. Supp. 2d 1306 (D. Kan. 2007). Neither case, however, involves the application of the current 12(b)(6) standard to a CERCLA claim. *Norwest* was decided before the Supreme Court retired the "no set of facts" language for evaluating the sufficiency of a Complaint. *Raytheon* involved a summary judgment motion, not a motion to dismiss.

*Co.*, Case No. 08-CV-13503-DT, 2010 U.S. Dist. LEXIS 88728, at *18 ( E.D. Mich. Aug. 27, 2010) ("It is simply not enough to allege that [plaintiff] incurred costs of response, without detailing any factual allegations in support of the statement; without alleging that the costs were necessary and explaining-even briefly—why they were necessary; or without otherwise enhancing the bare recitation of the element of a cost-recovery claim."). In line with this standard, the Court will consider United States' arguments about the sufficiency of the allegations in ARCO's Complaint.

   *2. Sufficiency of Plaintiff's Allegations*

   As already explained, to recover under CERCLA § 107(a)(4)(B), a private party must show that it incurred "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B). Here, ARCO maintains that it incurred such costs during two temporally distinct periods. First, as an alternative to its contribution claim, ARCO seeks reimbursement under § 107(a) for the $43.6 million it provided to Laguna Pueblo in 1986 to fund cleanup efforts at the Jackpile Site. Second, ARCO contends that it incurred various "necessary costs of response" in the last six years responding to Defendants' attempts to shift liability for additional remediation to ARCO. The United States attacks the viability of these claims separately.

   **a. Settlement Costs**

   In its MTD, the United States expressed confusion about whether ARCO intended to assert a cost-recovery claim for the repayment of the $43.6 million it gave to Laguna Pueblo under the 1986 Agreement to Terminate Leases. The United States argued that any such claim would be barred by the applicable statute of limitations. MTD at 15. ARCO did not respond directly to this argument, but did clarify that it was asserting a cost-recovery claim for the settlement expenses as an alternative to its post-settlement contribution claim. Response at 22.

ARCO, however, made no attempt to explain how such a claim – filed almost thirty years after the costs were incurred – could be considered timely. The Court concludes that it is time-barred and will not allow ARCO to proceed on this alternative theory.

Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), sets out two limitations periods for cost-recovery claims, one for removal actions and one for remedial actions:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—
>
> (A) for a removal action, within 3 years after completion of the removal action, except that such cost-recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost-recovery action brought under this subparagraph.

The United States claims that ARCO's attempts to recover $43.6 million dollars is untimely under either standard as cleanup efforts began sometime around 1986 and were deemed complete in 1995. Because ARCO does not comment on this analysis, the Court is unsure whether it agrees with the United States' representations about the completion of cleanup efforts at the Jackpile Site. Nevertheless, the Court concludes that any potential disagreement on this point would be immaterial. It is well-settled that a removal action is "geared to address an immediate release or threat of release" while a remedial action "seeks to effect a permanent remedy to the release of hazardous substances." *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1240 (10th Cir. 2003). Under these definitions, assuming ARCO's funding of Laguna's reclamation efforts constituted a recoverable response cost, the Court determines it was a remedial action rather than a removal action. Thus, ARCO was required to file its claim within 6 years after initiation of

physical on-site construction. This filing period has long since closed and the Court will dismiss ARCO's settlement cost-recovery claim as untimely.

### b.   Recent Expenses

As for ARCO's more recently incurred expenses, the United States contends that these costs are not tied to cleanup efforts and are, therefore, not recoverable. The United States makes two closely interrelated arguments in this regard. First, the United States contends that ARCO's Complaint fails to allege any "nexus" between the costs ARCO alleges it has incurred "and an actual effort to cleanup the environmental contamination" at the Jackpile Site. MTD at 12 (quoting *Young*, 394 F.3d at 864). Second, the United States argues that ARCO's claimed response costs, read in light of the other factual allegations in the Complaint, are more properly seen as "litigation costs incurred solely to defend [ARCO] in the enforcement action [ARCO] believed EPA would take against Plaintiff and absolve it from any liability at the [Jackpile] Site." MTD at 14.

Plaintiff construes the United States' argument about the missing nexus between ARCO's costs and cleanup efforts as an argument about timing. According to ARCO, the United States wrongly maintains that ARCO cannot recover preliminary investigation costs prior to the commencement of an "actual" on-the-ground cleanup effort. Plaintiff spends several pages refuting this perceived claim. The Court need not wade into this potential disagreement. In the reply, the United States clarifies that it is not making an argument about timing, but is instead arguing that "Plaintiff has failed to properly allege a 107(a) claim because Plaintiff has not alleged costs that are sufficiently tied to any containing or cleaning up of hazardous substances." Reply at 8. In other words, it appears that the United States agrees with ARCO that a physical cleanup is not a prima facie element of a § 107(a) CERCLA claim. Given this clarification, the

Court will not address ARCO's contentions about the recoverability of investigation costs in the absence of an "actual cleanup." Instead, the Court will focus on whether the allegations in the Complaint, including any allegations about proposed cleanup efforts, plausibly support ARCO's claim that it incurred costs that are directed at or necessary to cleaning up and containing hazardous waste.

There is a paucity of allegations in the Complaint regarding the nature of ARCO's alleged response costs. ARCO only identifies four potential costs: (1) submitting a response to the EPA's CERCLA § 104(e) request (Complaint ¶ 160); (2) "engag[ing] a consultant—URS Corporation—to conduct an analysis of current conditions at the Jackpile Site and the success of the cleanup work performed by the Laguna and [LCC] under government oversight" (*Id.* ¶ 161); (3) "submit[ing] comments on the Hazard Ranking System Documentation Record after EPA proposed listing the Jackpile Site on the NPL on March 15, 2015" (*Id.* ¶ 162); and (4) "retain[ing] technical experts to aid with the assessment and negotiations concerning the RI/FS and to identify [PRPs]." (*Id.* ¶ 163). In the Complaint, ARCO does not present any of these costs as attempts to help clean the Jackpile Site. To the contrary, ARCO prefaces the list of costs by explaining that Defendants were wrongly "attempting to shift responsibility for environmental remediation to [ARCO], even though [they had] released [ARCO] from any further responsibility for environmental remediation at the Jackpile Site." *Id.* ¶¶ 157-159. For example, ARCO complains that the United States "has sought to place sole responsibility for funding and/or performing the RI/FS" on ARCO. *Id.* ¶ 32; *see also* Response at 2 ("[T]he United States is trying to force [ARCO] to single-handedly finance the cleanup of the Jackpile Site a second time."). As a result, ARCO incurred costs hiring experts to assist with negotiations. Complaint ¶ 163.

As this summary illustrates, the costs ARCO seeks to recover – for compiling documents, hiring experts, and submitting comments – appear to be directed at potential litigation rather than containing and cleaning up hazardous wastes. Thus, these costs are not recoverable under CERCLA § 107(a). *See Hardage*, 982 F.2d at 1448 ("[W]hen a private party incurs response costs in developing its own remedy, solely to defend against the government's 106(a) injunction action, the private party's response costs are not 'necessary' within the meaning of CERCLA 107(a)(4)(B)."). ARCO's arguments to the contrary are hollow. ARCO admits that it has consistently resisted pressure to fund a cleanup because it believes that it has discharged its responsibility in regard to hazardous releases at the Jackpile Site. Moreover, ARCO does not deny that it incurred the above costs as part of its campaign to avoid liability for cleaning the Jackpile Site. Finally, while ARCO repeatedly asserts that it incurred costs "directly related to the cleanup effort," ARCO never explains how or why the specific costs alleged in the Complaint were necessary to remediation of the Jackpile Site. Given these facts, it is simply not plausible to infer that the costs ARCO seeks to recover have or are likely to contribute to containment or cleanup efforts. The Court will, therefore, dismiss ARCO's cost-recovery claims.

In reaching this conclusion, the Court was strongly influenced by *Young*, 394 F.3d 858. In *Young*, the Tenth Circuit Court of Appeals held that certain classic examples of preliminary investigation costs were not recoverable under CERCLA because the party who incurred the costs had no plans to conduct a cleanup and there was no nexus between the costs and a cleanup. In *Young*, the plaintiffs purchased property adjacent to the site of a discontinued smelting operation. *Young*, 394 F.3d at 861. The plaintiffs knew that the site of the smelting operation had been the subject of an EPA cleanup action, and they purchased the property for considerably less than its appraised value. *Id.* The plaintiffs then "surveyed their property, hired an environmental

consulting company to conduct an 'abbreviated' site investigation, and hired an environmental

hydrology and engineering company to assess the potential risks to humans who worked on

[plaintiffs'] property." *Id.* The plaintiffs took no further action to address the contaminants in

their property. *Id.* In fact, the plaintiffs "abandoned [the] property and [did] not intend to spend

any money to cleanup [sic] the contamination." *Id.* at 861–62.

      The district court granted summary judgment to the United States on the ground that

Plaintiffs had failed to prove that any of the costs they incurred were necessary or in compliance

with the NCP. The Tenth Circuit Court of Appeals affirmed. In relevant part, the Court stated:

> In this case, Plaintiffs claim they incurred $237,273 in responding
> to the release or threatened release of hazardous substances from
> the Eagle–Picher Superfund Site. To be sure, some of the costs
> Plaintiffs expended are "classic examples" of preliminary steps
> taken in response to the discovery of the release or threatened
> release of hazardous substances, such as site investigation, soil
> sampling, and risk assessment. Other costs Plaintiffs seek to
> recover, such as the cost of surveying their property, stretch the
> statutory language entirely too far. Plaintiffs' cost-recovery claim
> fails, however, even if we assume all costs they incurred could be
> properly classified as "response costs" because the costs were
> neither necessary to the containment and cleanup of hazardous
> releases nor consistent with the NCP.
>
> Plaintiffs' alleged response costs were not "necessary" to the
> containment or cleanup of hazardous releases because the costs
> were not tied in any manner to the actual cleanup of hazardous
> releases. Absolutely no nexus exists between the costs Plaintiffs
> expended and an actual effort to cleanup the environmental
> contamination. To the contrary, Plaintiffs maintain their property
> continues to be contaminated. Plaintiffs also repeatedly testified
> they do not intend to spend any money to cleanup the
> contamination on their property. Plaintiffs' cost-recovery claim
> therefore fails as a matter of law because their alleged response
> costs were not necessary to either the containment or cleanup of
> hazardous releases.

*Id.* at 864 (footnote omitted). Like in *Young*, ARCO is attempting to recover damages under §

107(a) even though it has admitted that it does not intend to voluntarily spend money funding an

actual cleanup of the environmental contamination. In other words, ARCO's desire to avoid liability (and incurring costs to do so) is equivalent to the *Young* plaintiffs' desire to obtain a recovery and not to actually clean up the land they purchased. As the Court in *Young* recognized, CERCLA requires parties to incur necessary response costs to prevent litigation gamesmanship and encourage the actual cleanup of hazardous substances. *Young*, 394 F.3d at 862 ("[T]he twin aims of CERCLA are to cleanup hazardous waste sites and impose the costs of such cleanup on parties responsible for the contamination. . . . The former, under the statutory scheme, must precede the latter."). Allowing ARCO's claims to proceed would violate these principles.

The Court finds ARCO's attempts to distinguish *Young* unpersuasive. First, ARCO argues that *Young* is inapplicable because that case was decided on a motion for summary judgment, not a motion to dismiss. But while the procedural posture of this case relieves ARCO of any obligation to produce *evidence* in support of its claims, ARCO still must show how its Complaint makes allegations of fact that "nudge[]" its claims for relief "across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. Here, the allegations show that ARCO, like the plaintiffs in *Young*, does not intend to voluntarily contribute to cleanup efforts.

Second, on the merits, ARCO argues that this case is factually distinguishable from *Young* because there have been cleanup efforts at the Jackpile Site and ARCO has shown a willingness to work with the government to advance these efforts. Of course, the mere existence of a cleanup effort does not create a viable CERCLA claim. The question is not whether the cleanup efforts are ongoing, but whether the plaintiff has incurred costs contributing to these efforts. For the reasons discussed above, the Court does not believe the Complaint supports such an inference. As for ARCO's contention that it has evinced a willingness to work with the EPA, to support this finding ARCO quotes liberally from materials attached to its Response. The Court

28

will not consider these materials in evaluating the Defendants' Rule 12(b)(6) motion. *See* Fed. R. Civ. P. 12(d). The Complaint does not contain any allegations indicating that ARCO intends to assist with cleanup efforts.

Finally, ARCO claims it incurred investigation and evaluation costs "relevant to the identification of PRPs." Complaint ¶¶ 161, 163. As ARCO emphasizes, the Supreme Court has held that such costs may be recoverable if they are "closely tied to the actual cleanup" and "serve[] a statutory purpose apart from the reallocation of costs." *Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994). ARCO, however, does not dispute that it already knew that the United States and Laguna Pueblo were PRPs prior to incurring investigation expenses. Thus, it is clear that these expenses were not directed at finding new PRPs who might contribute to cleanup efforts. They were instead focused on developing favorable evidence to support ARCO's claims about the proper allocation of costs between the respective parties. As a result, these costs are not recoverable. *See Key Tronic*, 511 U.S. at 820 (measures whose purpose is to reallocate the distribution of costs between PRPs are not necessary response costs); *see also 500 Assocs. v. Vt. Am. Corp.*, 768 F. Supp. 2d 914, 921 (W.D. Ky. 2011) (holding that costs incurred attempting to convince the Environmental Protection Cabinet that the corporation had no liability were not recoverable under CERCLA).

In sum, the Court concludes that ARCO's Complaint fails to make plausible allegations that it has incurred "necessary costs of response" as a result of "a release, or a threatened release…of a hazardous substance[.]" 42 U.S.C. § 9607(a)(4). However minimal ARCO's burden is to plausibly allege that it has incurred response costs in connection with an actual cleanup effort, it remains a burden. Under the Complaint's factual allegations, ARCO's expenses—hiring consultants, performing surveys, investigating other potentially responsible

29

parties—are more consistent with litigation-related expenses than with pre-cleanup response costs. It follows that ARCO has failed to allege facts that "nudge" the conclusion that ARCO has incurred necessary costs of response from the realm of the conceivable to the realm of the plausible. In other words, while it is possible to speculate that the comments, investigation, and surveys may ultimately play some role in the scope and form of a future Jackpile cleanup, these efforts "primarily protect[ed]" ARCO's own interests in protecting itself from liability and are not recoverable under CERCLA. *See Key Tronic*, 511 U.S. at 820-821. Accordingly, the Court will dismiss claims 1-3 of ARCO's Complaint against Defendant United States of America.

### 3. Plaintiff's Request to Amend

ARCO maintains that the response costs alleged in the Complaint "do not represent the totality of the recoverable costs incurred by [ARCO] to date." Response at 12. Based on this representation it asks for leave to amend to add specific allegations about response costs, if the Court finds that the allegations in the Complaint are not sufficient to withstand the United States' motion to dismiss. Response at 14. The Court will deny this request. Under D.N.M.LR-Civ. 15.1, a party seeking leave to amend its Complaint must attach the proposed amended Complaint to its motion. *Id.* ("[a] proposed amendment to a pleading must accompany a motion to amend."). Because ARCO did not comply with this rule, the Court cannot evaluate the futility of the proposed amendment. The Court will, therefore, deny ARCO's motion for leave to amend.

### B. ARCO's Contribution Claims (Count 4)

The elements of a contribution claim depend on whether the party asserting the claim seeks reimbursement for monies spent to satisfy a court judgment or a qualifying settlement. CERCLA § 113(f)(1) provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [42 U.S.C. §] 9607(a)…, during or following any civil

action under [42 U.S.C. §] 9606…or under [42 U.S.C. §] 9607(a)….” 42 U.S.C. § 9613(f)(1)

(post-judgment contribution claim). CERCLA § 113(f)(3), on the other hand, provides that “[a]

person who has resolved its liability to the United States or a State for some or all of a response

action or for some or all of the costs of such action in an administrative or judicially approved

settlement may seek contribution from any person” who has not also resolved its liability to the

United States or a State in an administrative or judicially approved settlement. 42 U.S.C. §

9613(f)(3)(B) (post-settlement contribution claim). Once again, Plaintiff asserts both types of

claim.

### 1. *ARCO's Post-Judgment Contribution Claim*

In its Response, ARCO explains that it asserted a § 113(f)(1) post-judgment contribution

claim against the United States in order to “insulate [itself] from joint and several liability for

costs incurred by others.” Response at 15. The clear language of § 113(f)(1), however, prohibits

the independent filing of such a claim in the absence of a pending or completed CERCLA action.

*See* 42 U.S.C. § 9613(f)(1) (allowing a party to seek contribution “during or following” a civil

action). In other words, “a private party who has not been sued under [CERCLA] § 106 or §

107(a) may [not] obtain contribution under [CERCLA] § 113(f)(1) from other liable parties.”

*Cooper Indus, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 160–161 (2004). Because ARCO has

not yet been sued under CERCLA (at least in relation to the Jackpile Site), ARCO's post-

judgment contribution claim is premature.

Notably, ARCO does not dispute this conclusion. Instead, ARCO contends that the Court

should deny the United States' motion to dismiss its § 113(b)(1) claim because ARCO believes

the United States will bring cost-recovery and contribution counterclaims against ARCO under

Fed. R. Civ. P. 13. *See* Response at 15–17. ARCO warns that “if the Court were to dismiss

[ARCO]'s § 113(f)(1) claim now, [ARCO] would merely have to reassert it as soon as the Government files a responsive pleading." *Id.* at 17. To summarize, ARCO concedes that, as matters currently stand, its § 113(f)(1) claim is legally deficient. But, ARCO argues that the Court should not dismiss this claim because dismissal would "serve no purpose and would waste the parties' and the Court's time." *Id*. at 16.

This argument is unconvincing. It is not within this Court's power to waive a necessary prerequisite of ARCO's post-judgment contribution claim in the interests of judicial efficiency. Even if it were, efficiency concerns do not cut in ARCO's favor. As the United States points out, if the Court grants the motion to dismiss, the United States will not be filing a counterclaim and the timing of any future claim against ARCO is purely speculative. Allowing ARCO's deficient § 113(f)(1) claim to survive in this situation, when none of ARCO's other claims are proceeding, would allow ARCO to force the United States' hand as to the timing of the lawsuit regarding ARCO's alleged responsibility for cleanup of the Jackpile Mine. Even if events had unfolded as ARCO anticipates – with the Court dismissing ARCO's § 113(f)(1) contribution claim, the Court the denying the United States' motion to dismiss ARCO's remaining claims, the United States filing a cost-recovery counterclaim, and ARCO reasserting a contribution claim – any imposition on the Court and ARCO would be slight. All ARCO would need to do is file a counterclaim or motion to amend reasserting the § 113(f)(1) claim. If ARCO was concerned with conserving court resources, it should have (1) waited until the appropriate time to file a § 113(f)(1) claim or (2) agreed to voluntarily withdraw the claim after being alerted to its premature filing. It is not ARCO's prerogative to ignore pleading requirements to save itself the minor inconvenience of having to wait to respond to a counterclaim until it is actually filed. The Court will dismiss ARCO's § 113(f)(1) claim under Rule 12(b)(6).

### 2. ARCO's Post-Settlement Contribution Claim

In the Complaint, ARCO asserts a § 113(f)(3) post-settlement contribution claim against the United States. Although the Complaint does not specify which settlement forms the basis of this claim, the only settlement discussed in the Complaint is the 1986 Agreement to Terminate Leases. Thus, the United States interprets ARCO's Complaint as seeking contribution from the United States for the $43.6 million ARCO paid to Laguna Pueblo as part of the 1986 Agreement. ARCO's response confirms that this is correct. ARCO maintains that the 1986 Agreement "resolved its liability to the United States . . . for some or all of a response action or for some or all of the costs of such action" as required by § 113(f)(3). Response at 18. It is on this basis that ARCO seeks reimbursement from the United States. In other words, ARCO contends that the Agreement is a qualifying settlement, that ARCO paid more than its equitable share in reaching this settlement, and that the United States should be required to compensate ARCO for the amount ARCO allegedly overpaid.

The United States presents two arguments that ARCO's § 113(f)(3) claim should be dismissed. First, the United States argues that the 1986 Agreement is not a qualifying settlement because the Secretary of the Interior did not have the authority to resolve CERCLA liability at the time of the Agreement's signing. As a result, the United States maintains the Agreement did not and could not resolve ARCO's liability to the United States. *See* MTD at 18–20.[10] Second, the United States argues that ARCO's § 113(f)(3) claim is time-barred. In the Reply, the United States does not pursue its first argument, but instead reiterates that the Court can "simply dismiss" ARCO's claim as untimely without assessing the "difficult arguments involving

---

[10] The United States also argues that the Agreement did not resolve ARCO's liability to a State because Laguna Pueblo is not a "State" under CERCLA. MTD at 18–20. By failing to address this argument in its Response, ARCO concedes that it is not asserting a § 113(f)(3)(B) claim under the theory that it resolved its liability to a State.

whether the Agreement to Terminate Leases constitutes an 'administrative settlement' that resolves liability to the United States." Reply at 12-13. Because the Court agrees that ARCO's § 113(f)(3) claim is time-barred, it will dismiss the claim without addressing the parties' heated dispute about the authority of the Secretary of the Interior and the nature of 1986 Agreement to Terminate Leases.

### a.   The Nature of ARCO's § 113(f)(3) Contribution Claim

In order to properly assess the parties' arguments regarding the statute of limitations, it is necessary to have a firm grasp on the nature of ARCO's § 113(f)(3) contribution claim. A § 113(f)(3) contribution action allows a party "who has settled a cost-recovery claim with the government . . . [to] seek contributions from **other** PRPs." *Friedland*, 566 F.3d at 1206 (emphasis added). In other words, in a properly formulated § 113(f)(3) contribution action, the plaintiff seeks repayment from the defendant for funds that the plaintiff expended resolving its liability to the United States. *See Atl. Research Corp.*, 551 U.S. at 138 (defining contribution as the "tortfeasor's right to collect from others responsible for the same tort **after** the tortfeasor has paid more than his or her proportionate share") (emphasis added). Conceptually this is a fairly narrow claim. Section 113(f)(3) contribution involves the reimbursement of settlement funds, and is, consequently, limited to recovery of such funds. *See Raytheon Aircraft Co. v. United States*, 435 F. Supp. 2d 1136, 1144 (D. Kan. 2006) ("[A] proper reading of section 113(f)(3)(B) is one that limits a plaintiff's right to contribution to those response costs for which it has resolved its liability in settlements with the United States or a State. Stated another way, the right to contribution under section 113(f)(3)(B) is defined by the scope of the liability resolved.").

Although ARCO attempts to shoehorn its theory of governmental wrongdoing into this narrow framework, it simply does not fit. What ARCO has pled as a contribution claim is not a

contribution claim in the traditional sense. Unlike in the archetypal § 113(f)(3) case, ARCO does not want contribution from a third-party for funds ARCO paid to a state or federal government as part of a qualifying settlement. Rather, ARCO is asking the United States refund money ARCO allegedly spent resolving its liability to the United States.[11] This is legally nonsensical. A contribution claim is not an appropriate mechanism for a dissatisfied party to dispute or request readjustment of the amount paid to resolve claims with the government. As already discussed, a contribution action allows a tortfeasor to collect money "from others" to cover costs spent reimbursing an injured party. *Friedland*, 566 F.3d at 1206. A contribution claim looks outwards; it does not challenge the fairness of the underlying settlement. ARCO's § 113(f)(3) "contribution" claim runs afoul of this basic principle and is, therefore, fundamentally untenable.

Even if there could be any question about this straightforward analysis, the plain language of § 113(f)(2) prohibits ARCO from bringing a contribution claim against the state or federal government which whom it has allegedly settled. CERCLA § 113(f)(3) states:

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

Paragraph (2) states:

---

[11] ARCO never states its intentions this bluntly. However, it is clear that ARCO's § 113(f)(3) contribution claim is an attempt to reopen the settlement. This is the only conclusion to be drawn from ARCO's contentions that: (1) the 1986 Agreement resolved its liability to Laguna Pueblo and the United States; (2) in resolving its liability, ARCO paid more than its equitable share; and (3) to fix this inequity, the Court should require the United States to return a portion of the funds that acted as consideration for the release of liability to the United States. The Court recognizes the $43.6 million ARCO paid as part of  the settlement was remitted to Laguna Pueblo not the United States. However, this does not change the character of the funds at issue, which acted as the consideration ARCO offered for the alleged release of its liability to the United States. Under ARCO's interpretation of the Agreement, ARCO paid money to Laguna Pueblo to be used for the cleanup of the Jackpile Mine and, in exchange, Laguna Pueblo and the United States released ARCO from all liability for the costs of remediating the site. *See* Response at 21 (insisting that the United States was a party to the agreement and made independent promises under the agreement).

> A person who has resolved its liability to the United States or a State in an administrative
> or judicially approved settlement shall not be liable for claims for contribution regarding
> matters addressed in the settlement.

Read together these two sections shield from liability under § 113(f)(3) any person who is a party to a qualifying settlement. This would necessarily include the governmental entity with whom the party seeking contribution has settled. At the risk of repetition, ARCO cannot settle with the United States and then use this settlement as justification for bringing a contribution action against the United States to recoup settlement expenditures. ARCO's § 113(f)(3) claim fails at the most basic level as a matter of law. Because the United States has not raised this argument, however, the Court will not dismiss ARCO's claim on this basis. The Court has discussed the nature of ARCO's claim simply to provide a context for understanding ARCO's arguments about equitable tolling, which are all premised on a fundamental misunderstanding of the purpose and scope of a § 113(f)(3) contribution claim.

> *b.   Statute of Limitations*

The statute of limitations is an affirmative defense. Nonetheless, a court may grant a motion to dismiss a claim as time-barred, if "the dates given in the Complaint make clear that the right sued upon has been extinguished." *Aldrich v. McCulloch Properties*, 627 F.2d 1036, 1041 (10th Cir. 1980); *see also Glaser v. City & County of Denver*, 557 F. App'x 689, 698 (10th Cir. 2014) ("[A] statute of limitations question may be appropriately resolved on a motion to dismiss."). Here, the United States argues that ARCO's § 113(f)(3) contribution claim is subject to either a three-year statute of limitations under 42 U.S.C. § 9613(g)(3) or a six-year statute of limitations under 28 U.S.C. § 2401(a). The United States asserts that ARCO's claim is untimely under either period as it was filed nearly thirty years after the settlement which forms the basis of the claim.

36

ARCO agrees that its § 113(f)(3) claim falls outside the applicable statute of limitations and must be considered time-barred in the absence of equitable tolling. The Court accepts this stipulation for the purposes of ruling on the United States' motion to dismiss. As a result, the Court need not resolve which statute provides the applicable deadline for filing § 113(f)(3) post-settlement contribution claims. Similarly, the Court will assume, without deciding, that the statute of limitations is non-jurisdictional and therefore subject to equitable tolling. *See United States v. Rohm and Haas Co.*, No. 09-5528, 2010 WL 3811302 at *7 (D.N.J. Sept. 22, 2010). The question then becomes whether ARCO has alleged facts showing that it is entitled to equitable tolling of the statute of limitations.

In order to be entitled to equitable tolling of the limitations period, ARCO must show that (1) it "has been pursuing [its] rights diligently, and (2) that some extraordinary circumstance stood in [ARCO's] way[.]" *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Here, ARCO maintains that the statute of limitations must be equitably tolled because the United States "actively misled or, at a minimum, lulled" ARCO into failing to assert contribution claims against it in a timely fashion. Response at 25 (quotation marks omitted). According to ARCO, it relied on the United States' false promises that the United States "would not require [ARCO] to conduct or fund additional cleanup at the site." *Id.* As a result, ARCO was supposedly unaware that it had contribution claims against Defendants until 2014, when the EPA informed ARCO that it was potentially liable for contamination at the Jackpile Site in violation of the prior Agreement. *Id.* at 26.

ARCO's arguments reveal a fundamental confusion about the nature of a § 113(f)(3) claim. As the Court has explained in some detail, ARCO's § 113(f)(3) contribution claim is a claim for reimbursement of funds expended as part of the qualifying settlement agreement. The

gravamen of the claim is an assertion that ARCO paid more than its equitable share when it gave $43.6 million to fund a proposed cleanup. This claim should have been apparent to ARCO from the moment the settlement was entered. In fact, ARCO never provides any argument why this would not be the case. Instead, ARCO complains that it "agreed to pay its share of the remediation costs up front" and that the United States is now wrongly trying to impose "new liability" on ARCO for "past conduct that it reasonably believed was settled many years ago." Response at 25-26. Even if the Court accepts these allegations as true, they do not provide a basis for equitable tolling of the § 113(f)(3) contribution claim. The validity of this claim has nothing to do with whether the United States subsequently honored its alleged promises to release ARCO from liability. As a result, all of ARCO's arguments about equity and justice are beside the point. The United States' alleged failure to honor its promises sounds in breach of contract not contribution. Hence, this failure does not provide a basis for tolling the statute of limitations. The Court will dismiss ARCO's § 113(f)(3) claim as time-barred.

### 3.   ARCO's Declaratory Judgment Claims (Count 5)

CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), states:

> In any [cost-recovery or contribution] action…, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under [42 U.S.C. §] 9607…for recovery of costs at any time after such costs have been incurred.

ARCO contends that under *Cnty. Line Inv. Co. v. Tinney*, 933 F.2d 1508 (10th Cir. 1991), a plaintiff who has not yet incurred necessary costs of response may nonetheless obtain a

declaration of responsibility for future costs under 42 U.S.C. § 9613(g)(2). *See* Response at 27.

In other words, ARCO argues that it need not state a claim for relief for cost-recovery under

CERCLA § 107(a) in order to seek a declaration that Defendants are liable for some or all of

ARCO's future response costs at the Jackpile Site.

Defendants argue that what ARCO calls a holding is actually dicta. *See* MTD at 24 n.7.

The United States puts great emphasis on (1) the fact that *Tinney* affirmed a district court's entry

of summary judgment against the plaintiff on all of its CERCLA claims, including the plaintiff's

declaratory judgment claim under CERCLA § 113(g)(2); and (2) that *Tinney* only held out the

possibility that "a CERCLA plaintiff may be entitled to a declaration of the defendant's liability

even though the plaintiff has not yet established that *all* of its claimed response costs were

incurred consistent with the NCP." *Tinney*, 933 F.2d at 1513 (emphasis added).

Thus, ARCO's interpretation of *Tinney* (and by extension CERCLA § 113(g)(2)) is that

the mere existence of costs, <u>whether necessary or not</u>, are sufficient for declaratory relief; and the

necessity of those costs, their consistency with the NCP, and any other considerations may be

deferred until a determination of liability is made. The United States' view is that ARCO's

'costs' are necessary but not sufficient to state a claim for declaratory relief. In other words, the

United States argues that a valid claim for cost-recovery under CERCLA § 107(a) is a necessary

prerequisite to declaratory relief under CERCLA § 113(g)(2). The United States interprets

*Tinney* to allow a claim for declaratory relief to proceed only when some, even if not all, of the

Plaintiff's costs are necessary and consistent with the NCP.

The Court agrees with the United States that a plaintiff cannot bring a claim for

declaratory relief under § 113(g)(2)(B) in the absence of a valid underlying contribution or cost-

recovery claim. CERCLA § 113(g)(2)(B) permits declaratory relief only "[i]n any such action

described in this subsection[.]" And the "action[s]" described in CERCLA § 113(g) are actions

for cost-recovery under § 9607(a), contribution under § 9613(f), subrogation, and actions to

recover indemnification payments. 42 U.S.C. § 9613(g)(2), (3), (4), (5). In other words, ARCO's

reading of *Tinney* contradicts the plain meaning of CERCLA § 113(g)(2), which incorporates §

107(a) cost-recovery claims by reference.

   Moreover, allowing ARCO to pursue declaratory relief without establishing its

entitlement to relief for cost-recovery or contribution would destabilize the intended functioning

of CERCLA because it would allow a plaintiff who has incurred no necessary costs of response

and has  no present intent to incur such costs to short-circuit CERCLA's remedial scheme, which

prioritizes cleanups over formal determinations of liability. Second, as the Ninth Circuit Court of

Appeals noted in *Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998 (9th Cir. 2010),

> awarding declaratory relief before a plaintiff has incurred any
> recoverable costs would undermine the very purpose of declaratory
> relief, which is to economize on judicial time. A court would have
> to make complicated determinations as to which defendants are
> responsible for what proportion of the release, without any
> assurance that the plaintiff would ever meet its burden of proving
> in an adversary proceeding that its expenses were necessary and
> incurred in a manner consistent with the national contingency plan.

614 F.3d at 1008 (quotation, alteration omitted). As the Court has already noted, the Complaint

does not "nudge" ARCO's allegations of having incurred necessary costs of response across the

line from conceivable to plausible. This much requires the Court to dismiss ARCO's cost-

recovery claim. But allowing ARCO to proceed with its claim for declaratory relief would give

ARCO the relief it wants—a determination of the United States' and Laguna Pueblo's

proportionate liability for the cost of remediating the Jackpile Site—without requiring ARCO to

show why it is entitled to reimbursement as a result of such a determination. Accordingly, the

Court will dismiss ARCO's claim for declaratory relief against Defendant the United States of America.

IT IS THEREFORE ORDERED THAT:

1. The United States' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF SUBJECT MATTER JURISDICTION BY UNITED STATES OF AMERICA (Doc. No. 32) is GRANTED.

2. By separate order of dismissal, the Court will dismiss Counts 1-5 against the United States with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE